UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**MARY LUBNER,**

    Plaintiff,

    v.                                      Case No. 24-CV-359-SCD

**CITY OF CEDARBURG,**
**MICHAEL McNERNEY,**
**DUSTIN KOEHLER,**
**JOHN DOES 1-10,** and
**ABC INSURANCE COMPANY,**

    Defendants.

---

## DECISION AND ORDER
## GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

The Ozaukee County District Attorney's Office charged 76-year-old Mary Lubner with maintaining a drug trafficking residence.[1] Cedarburg police searched Ms. Lubner's home based on suspicion that other adult residents possessed or sold drugs. Cedarburg police detective Dustin Koehler's post-search report focused on Ms. Lubner's adult son Erich and his friend Jason Gasser, but Koehler supplemented his report after receiving a call from assistant district attorney Antonella Aleman-Zientek. The supplement stated that drugs were found in common spaces that Ms. Lubner would have accessed. The Ozaukee County DA's office charged Ms. Lubner for maintaining a drug trafficking residence and the county

---

[1] Citing the plaintiff's own declaration, the plaintiff's proposed findings say she is eighty years old. (ECF No. 28 at 1.) However, her declaration does not say anything about her age. The only notation in the record, from the police department, states that her birthday is July 14, 1946, which would make her 75 years old at the time of the events in question (March 2022).

sheriff's department arrested her. The charges against Ms. Lubner were eventually dismissed pursuant to a stipulation.

Convinced that her arrest was unconstitutional, Ms. Lubner sued Koehler, the City of Cedarburg, police chief Michael McNerney, and ten John Doe police officers, in federal court. In her complaint, Ms. Lubner labels these counts: (1) 42 U.S.C. § 1983 claim against Koehler and John Doe defendants; (2) *Monell* municipal liability against Cedarburg and Chief McNerney; (3) state-law negligence claim against Koehler and John Doe defendants; (4) state-law negligent training and supervising claim against Cedarburg and Chief McNerney; (5) indemnification under Wis. Stat. § 895.46; (6) direct action against the insurance company under Wis. Stat. § 632.24; (7) legal fees under 42 U.S.C. § 1988; (8) malicious prosecution claim against Koehler and John Doe defendants; and (9) abuse of process claim against Koehler and John Doe defendants. Compl. 7–14, ECF No. 1. Ms. Lubner did not respond to the defendants' argument that the unidentified John Doe defendants must be dismissed. *See* Pl. Br., ECF No. 27. She concedes that count 5 pertains to damages and should be dismissed inasmuch as it fails to set forth an independent claim. *See id.* at 28. Counts 6 and 7 also pertain to damages and should be dismissed as claims. *See* Compl. 12–13, ECF No. 1. She concedes dismissal on counts 2 and 9. *See* Pl. Br. 19, 27, ECF No. 27. Therefore, the § 1983 claim against Koehler remains, as well as the state-law negligence and malicious prosecution claims against Koehler, and the negligent training and supervision claim against Cedarburg and Chief McNerney.

The defendants have moved for summary judgment on all of Ms. Lubner's claims. Defs.' Mot. Summ. J., ECF No. 18. They argue that the supplemental report was accurate and therefore did not violate Ms. Lubner's constitutional rights, and discretionary immunity

2

shields the defendants from liability on the state claims. Defs.' Reply Br. 8–9, 11–12, ECF No. 35. Ms. Lubner has failed to show a dispute of material fact that would create a constitutional violation, and discretionary immunity applies to the defendants' actions. I will therefore grant the defendants' motion for summary judgment.

## BACKGROUND

The facts are largely undisputed up until the supplemental report. I will rely on the parties' materials submitted in compliance with Fed. R. Civ. P. 56, Civ. L. R. 56, and 28 U.S.C. § 1746. I will cite to the paragraphs as numbered in each filing (one paragraph was misnumbered, resulting in subsequent paragraphs' misnumbering). *See* Pl.'s Resp. to Defs.' Facts, ¶ 17, ECF No. 29.

### I. Ms. Lubner's Residence

Mary Lubner, a retired PE teacher, lived in her home at N76W6933 Linden Street in Cedarburg, Wisconsin. Defs.' Facts ¶ 1, ECF No. 19; Pl.'s Facts ¶¶ 1–4, ECF No. 28. Ms. Lubner's adult son Erich has struggled with drug addiction for a long time. *See* Defs.' Facts ¶¶ 4–7, ECF No. 19; Pl.'s Facts ¶¶ 5, ECF No. 28. Ms. Lubner has tried to help Erich, at times allowing him to live with her when he had nowhere else to go, banning him from her house for a period because of his drug use, and calling the police to search her home and arrest Erich if drugs were found. *See* Defs.' Facts ¶ 6, ECF No. 19; Pl.'s Facts ¶¶ 6–11, ECF No. 28.

In March 2022, Erich and his friend Jason Gasser were living at the Linden Street home. Defs.' Facts ¶¶ 2–3, ECF No. 19; Pl.'s Facts ¶¶ 12–13, ECF No. 28. Ms. Lubner lived on the main level. Pl.'s Facts ¶ 17, ECF No. 28. Erich and Gasser spent most of their time in the basement. *Id.* ¶¶ 14–16. Gasser had a bedroom upstairs that he rarely used. *Id.* ¶¶ 16, 23. Laundry was done downstairs in the basement. *See id.* ¶ 60; Defs.' Facts ¶ 67, ECF No. 19.

3

Ms. Lubner rarely went to the basement due to mobility issues from knee surgery complications, and she relied on Erich for assistance with laundry. Pl.'s Facts ¶¶ 18–20, 60, ECF No. 28. However, while the search warrant was executed, Ms. Lubner was teaching Taekwondo, which might require mobility. *See* Defs.' Resp. to Pl.'s Facts, ¶¶ 19–20, ECF No. 33.

II. Search

Around March 9, 2022, Detective Koehler received a call from the Gainesboro, Tennessee police department reporting an intercepted package heading to Cedarburg, Wisconsin. Defs.' Facts ¶¶ 19–20, ECF No. 19. The package contained methamphetamine, fentanyl, marijuana, heroin, and drug paraphernalia, and was enroute to Ms. Lubner's home. *Id.* Text messages revealed Jason Gasser was the intended recipient. *Id.* ¶ 22. Detective Koehler linked the address to Erich Lubner, reviewed Erich and Gasser's criminal histories, and confirmed via social media that Erich and Gasser knew the Tennessee suspects. *Id.* ¶¶ 23–27. After consulting with the Ozaukee County DA's office, a garbage pick was conducted at the Linden Street residence, which revealed syringes and corner-cut baggies. *Id.* ¶¶ 29–31. Based on this information, Koehler coordinated with the DA's office to apply for a warrant to search the Linden Street residence, which was approved on March 10, 2022. *Id.* ¶¶ 41–50.

Koehler executed the search warrant the same day with several other Cedarburg police officers. *Id.* ¶ 51. The officers found marijuana and drug paraphernalia in the basement. *Id.* ¶¶ 60–61; Pl.'s Facts ¶ 21, ECF No. 28. A few drug paraphernalia items were found in Gasser's upstairs bedroom, and a needle was found in an office on the main level. Defs.' Resp. to Pl.'s Facts, ¶¶ 22–23, ECF No. 33. Gasser was the intended target of the search; no one suspected Ms. Lubner was doing or trafficking drugs. Pl.'s Facts ¶¶ 37–39, ECF No. 28. Erich and Gasser

4

were taken into custody for possession of drug paraphernalia; Erich's charges were later upgraded to maintaining a drug trafficking place, and Gasser's were downgraded to a municipal ordinance violation. Defs.' Facts ¶¶ 60, 68–69, ECF No. 19.

## III. Post-search actions

Koehler sent to the DA's office the probable cause statements for arresting Gasser and Erich, and reports documenting the search. *Id.* ¶¶ 63–64; Koehler Dep. 45, ECF No. 22-4; Pl.'s Facts ¶¶ 43–45, 50, ECF No. 28. At some point, Ozaukee County ADA Antonella Aleman-Zientek called Koehler requesting a supplemental report that addressed Ms. Lubner. Defs.' Facts ¶ 66, ECF No. 19; Pl.'s Facts ¶¶ 51–53, ECF No. 28. The parties dispute the nature of this conversation. Ms. Lubner says that Koehler was "fed information" from Aleman-Zientek to better fit the statute for maintaining a drug trafficking residence. Pl.'s Resp. to Defs.' Facts, ¶¶ 64–65, ECF No. 29; Defs.' Resp. to Pl.'s Facts, ¶¶ 51–52, ECF No. 33. Defendants say that it's not unusual for a DA to request a follow-up from an officer, and Koehler's supplement was accurate to his observations and beliefs. *See* Defs.' Resp. to Pl.'s Facts, ¶ 51, ECF No. 33; Pl.'s Resp. to Defs.' Facts, ¶¶ 64–65, ECF No. 29.

In his deposition, this is how Koehler spoke about the conversation with Aleman-Zientek:

> **Attorney:** What was the conversation with the DA's office to create this supplemental report? Why were they asking for it?
>
> **Koehler:** I was asked by Antonella, the ADA, to – or I was told by her that they currently wanted Mary Lubner to be taken into custody because they were now not going to – or they were going to pursue charges against her for maintaining a drug trafficking residence, and she wanted me to, I guess, expand upon what was seen in the house to – I believe she wanted me to clarify that Mary Lubner would have had access to the basement so that it would statutorily fit better for the maintaining a drug house charge.

5

> **Attorney:** Right. So how—so the DA—the DA's office and ADA Antonella, she had received all of the information from the arrests on Erich and Jason?
>
> **Koehler:** Correct.
>
> **Attorney:** And in your investigation's mind, this was closed, done deal?
>
> **Koehler:** Correct.
>
> **Attorney:** And then she comes back and says, "I actually want another report done"?
>
> **Koehler:** She wanted a supplement done to, I guess, highlight the charges of the drug trafficking place which I at the time was irritated with and didn't agree with them even going after Mary Lubner. I was okay doing the supplement because statutorily what I did see in the language would infer that, yes, maybe a drug house was going on. Because she was considering it to be, like, a flop house where, like, everyone goes to shoot up. I never believed that to be the case, but that was now what they wanted to go after.
>
> So I was okay writing this at the time because, yes, you could, based on the language of the statute, believe that that's what was taking place there. So the things within there are accurate and true. I don't think they're in the spirit of the statute, but I think they do fit language-wise if you want to pick it apart, and that's what she wanted me to document in this supplement.

Koehler Dep. 62–63, ECF No. 22-4. Presumably this conversation occurred on March 11, 2022. *See* ECF No. 31-3 at 42 (From the supplemental report: "On March 11, 2022 I was contacted by Assist District Attorney ALEMAN ZIENTEK, and based on the above facts and the facts contained within the original report related to this case, she stated that she wanted MARY taken into custody for maintaining a drug dwelling under 961.421.").

On March 13, 2022, Koehler submitted the supplemental report. *See id.* Its contents are undisputed:

> The basement of the home had a very large amount of drug paraphernalia littered all over, including spoons that had been used for cooking, cooking tins, marijuana pipes, vaping devices for marijuana, an extremely large number of syringes lying in multiple areas, tie offs and small cotton balls used for filtering heroine after cooked. It was very evident of anyone that would have been living within the home to know that drug use was taking place within the home and

> also the selling of drugs. There was a bedroom in the basement that had a large number of empty bags that had contained marijuana in larger quantities such as half and one pound bags and there were numerous bags that were empty. There was also vacuum sealed bags and I believed at some point, maybe not recently, but in the not to distant past there was a large amount of marijuana most likely being sold from the residence. The home had a slight odor of marijuana in it and again had multiple items of drug paraphernalia and drugs in plain view mostly being the basement area. *The basement had common areas where the homeowner, MARY F LUBNER f/w 07-14-1946 would have walked through regularly as to get to the laundry area of the home and in walking from the steps into that area, would have noticed the paraphernalia and drug use.*

*Id.*; Defs.' Resp. to Pl. Facts, ¶ 59, ECF No. 33 (emphasis added). Ms. Lubner does not dispute that Koehler subjectively believed this supplement was accurate as to his observations. Pl.'s Resp. to Defs.' Facts, ¶ 65, ECF No. 29. Ms. Lubner also does not dispute that Koehler believed Ms. Lubner's conduct established probable cause for the maintaining a drug trafficking residence statute. *Id.* ¶ 71. Put simply, Koehler disagreed with whether the DA's office *should* charge Ms. Lubner as a matter of discretion; not whether they *could* as a matter of law. *See id.*

In the supplement, Koehler also said that Aleman-Zientek requested that Ms. Lubner be "taken into custody" for maintaining a drug dwelling under 961.421. ECF No. 31-3 at 42. Confusingly, Aleman-Zientek and DA Adam Gerol refer to this as "arresting Mary Lubner," but it seems there was no arrest warrant at that point. *See generally* ECF No. 31-6. Officers tried to make contact with Ms. Lubner, but she wasn't home. *See* ECF No. 31-3 at 71.

On March 18, 2022, Koehler and Aleman-Zientek exchanged emails. Pl.'s Facts, ¶ 62, ECF No. 33. Koehler told Aleman-Zientek that the police wouldn't be taking Ms. Lubner into custody, but that charges had been forwarded to the DA's office (administratively, officers "send up" a requested charge for the DA's office to review their investigation documents and the DA's office decides how to proceed). *See id.* ¶ 63; ECF No. 22-4 at 72–73; ECF No. 31-3

7

at 100. Things escalated to the supervisors. Police chief Michael McNerney emailed DA Gerol saying that his department would be sending up a memo rescinding the requested charges against Ms. Lubner because they disagreed with the charging decision. Pl.'s Facts, ¶ 64, ECF No. 33; Defs.' Facts, ¶ 72, ECF No. 19. But if the DA's office got an arrest warrant, then the department would enforce it; McNerney says: "if you want her charged you can do that and if an arrest warrant is issued, we will keep an eye out for her." *See* ECF No. 31-6. This led to an email back-and-forth. *See id.*; Pl.'s Facts, ¶¶ 64–65, 74, ECF No. 28.

The record is murky on the legal proceedings leading up to Ms. Lubner's arrest. The Cedarburg Police Department didn't prepare the arrest warrant or arrest Ms. Lubner. Defs.' Facts, ¶¶ 75–76, ECF No. 19. On March 22, 2022, Ms. Lubner was charged with a felony drug offense. Pl.'s Facts, ¶ 66, ECF No. 28. The Ozaukee County sheriff's department arrested her the next day. *Id.* ¶ 67; Koehler Dep. 75, ECF No. 22-4. An arrest warrant is not in the record, so it's not clear whether or how the supplement was later used. Ms. Lubner spent one day in jail before posting bond, her mugshot was publicly displayed, she was terminated from several volunteer organizations, and she spent thousands in legal fees, before the charges against her were ultimately dismissed pursuant to a stipulation. *Id.* ¶¶ 68–69, 72–74; Compl. ¶ 35, ECF No. 1.

In March 2024, Ms. Lubner filed a complaint in federal court against the City of Cedarburg, Chief of Police Michael McNerney, Detective Dustin Koehler, John Doe officers one through ten, and ABC insurance company. ECF No. 1. The clerk of court randomly assigned the case to me, and Ms. Lubner and the identified defendants consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 3, 11. The John Doe defendants haven't consented. On July 3, 2025, the defendants filed

8

a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See* Defs.' Mot. Summ. J., ECF No. 18; Defs.' Br., ECF No. 23. Ms. Lubner filed a response to the motion. *See* Pl.'s Resp., ECF No. 27. The defendants also filed a reply brief. *See* Defs.' Reply, ECF No. 35.

**LEGAL STANDARD**

Under Rule 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Liberty Lobby*, 477 U.S. at 255).

**DISCUSSION**

At this point, Ms. Lubner asserts four causes of action. *See* Compl. 7–14, ECF No. 1; *see* Pl. Br. 28, ECF No. 27. Ms. Lubner brings: (1) a § 1983 claim against Koehler, (2) a state-law negligence claim against Koehler; (3) a state-law negligent training and supervision claim against Cedarburg and Chief McNerney; and (4) a malicious prosecution claim against Koehler. *See* Compl., 7–14, ECF No. 1; *see* Pl. Br. 28, ECF No. 27.

9

I.   **Koehler is Entitled to Summary Judgment on Ms. Lubner's § 1983 claim.**

Koehler argues both that he did not violate Ms. Lubner's rights, and that, even if he did, he is entitled to qualified immunity. Upon a defendant's invocation of qualified immunity at summary judgment, the plaintiff shoulders the burden of demonstrating both (1) that the defendant violated a constitutional right and (2) that the constitutional right was clearly established at the time, such that "a reasonable official would understand that what he is doing violates that right." *Mabes v. Thompson,* 136 F.4th 697, 705 (7th Cir. 2025) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). The Supreme Court has instructed that it is often preferable for courts to avoid rendering a decision on a constitutional question (the first part of the qualified immunity analysis) if the matter may be resolved by concluding that no "clearly established" right existed (the second step). *City & Cnty. of San Francisco v. Sheehan,* 575 U.S. 600, 617 (2015). However, the Court has also noted that some cases are more appropriately decided on the first prong (also called the "merits") of the qualified immunity analysis. *Pearson v. Callahan,* 555 U.S. 223, 236 (2009). Here, I conclude that the question isn't so much whether a "clearly established" right was violated, it is whether the facts could show that *any* right was violated at all. Therefore, the circumstances render it more efficient to address the first step of the analysis, i.e., whether the facts establish the violation of any constitutional right. I conclude they do not.

An unconstitutional seizure occurs when someone is arrested without probable cause. *Smith v. City of Chicago*, 913 F.2d 469, 473 (7th Cir. 1990). Put differently, probable cause is a defense to a false arrest. But that probable cause can't be based on "the defendant's intentional misrepresentation or concealment of material facts." *See id.* (quoting *Schertz v. Waupaca Cnty.*, 875 F.2d 578, 582 (7th Cir. 1989)). "An officer violates the Fourth Amendment if he

intentionally or recklessly includes false statements in a warrant application and those false statements were material to a finding of probable cause." *Rainsberger v. Benner*, 913 F.3d 640, 647 (7th Cir. 2019). The first question, therefore, is whether Koehler made a false statement, and the second question is whether the false statement was material to a probable cause finding. *Id.* at 650–51. "We use a straightforward method to determine whether the alleged lies or omissions are material: 'We eliminate the alleged false statements, incorporate any allegedly omitted facts, and then evaluate whether the resulting "hypothetical" affidavit would establish probable cause.'" *Id.* (quoting *Betker v. Gomez*, 692 F.3d 854, 862 (7th Cir. 2012)).

### A. No fact shows that Koehler presented misleading evidence.

It is undisputed that Koehler subjectively believed that his supplemental report was accurate as to his observations. It is disputed whether his observations were ultimately correct. The key phrase Ms. Lubner points to as misleading is: "**The basement had common areas where the homeowner, MARY F LUBNER f/w 07-14-1946 would have walked through regularly as to get to the laundry area of the home and in walking from the steps into that area, would have noticed the paraphernalia and drug use**." Defs.' Reps. to Pl.'s Facts ¶ 59, ECF No. 33. Ms. Lubner alleges that this statement veers into speculation, even if Koehler believed the truth of it, because she rarely used the laundry and, when she did, she needed her son to help her because her two knee surgeries caused issues with mobility.

Ms. Lubner contends that even technically true information can violate the Fourth Amendment when presented in an intentionally misleading way. She quotes *Rainsberger v. Benner* to support this proposition, but the words she "quotes" aren't from that case—or, for that matter, from any case I can find. *See* Pl.'s Br. 12, ECF No. 27 (quoting *Rainsberger v.*

*Benner*, 913 F.3d 640 (7th Cir. 2019)). In any event, in *Rainsberger*, a detective conceded that he knowingly or recklessly made false statements in a probable cause affidavit that led to an arrest warrant, and the question on appeal was whether those false statements were material (they were). The Seventh Circuit applied *Franks v. Delaware*, 438 U.S. 154 (1978) to this civil unreasonable seizure context. "*Franks*'s requirement of a 'substantial preliminary showing' that the officer deliberately misrepresented facts in a warrant affidavit applies in civil as well as criminal actions." *Id.* at 651 (quoting *Perlman v. City of Chi.*, 801 F.2d 262, 264–65 (7th Cir. 1986)). Unlike in *Rainsberger*, here, Koehler does not concede that his supplemental report was false, so *Franks* dictates whether his report contained deliberately misrepresented facts. *See Perlman v. City of Chi.*, 801 F.2d at 264.

Truthfulness means that "the information put forth is believed or appropriately accepted by the affiant as true." *Franks*, 438 U.S. at 165. "To be sure, truthfulness does not require that every fact recited in the warrant affidavit is necessarily correct, nor does completeness require law enforcement to provide every detail of an investigation." *United States v. Taylor*, 63 F.4th 637, 648 (7th Cir. 2023) (citation modified). "The relevant inquiry focuses on the officer's belief about the facts recounted, not the validity of the underlying facts themselves." *United States v. Norris*, 640 F.3d 295, 301 (7th Cir. 2011).

The relevant inquiry is Koehler's belief about Ms. Lubner, not her actual mobility or the frequency of her use of the laundry room. The problem Ms. Lubner faces is that she has supplied no fact suggesting that Koehler knew about her mobility issues when he wrote the supplemental report. Ms. Lubner argues that it was reckless to speculate that she could walk down the stairs. But Koehler's statement that Ms. Lubner "would have walked through regularly as to get to the laundry area of the home" is hardly speculative. In fact, it would be

12

speculative for an officer to have assumed that the owner of a house would *not* regularly walk through a common area to use the laundry. We live in an age in which the age of seventy-five is not considered particularly enfeebled or ancient. Without knowing any more about the situation, one would find it perfectly normal that an eighty-year-old woman would be able to regularly do her laundry. For Koehler's assumption to be knowingly false or reckless, he would have needed knowledge that Ms. Lubner had mobility issues, and there is nothing in the record to suggest he could have known that.

Ms. Lubner also argues that the police should have done their homework and researched the layout of the house more thoroughly. If they'd done that, they would have realized that the upstairs and downstairs were essentially separate units and that she'd have little reason to go downstairs to snoop around. That argument, however, ignores the fact that there was a single laundry in the house, and it was in the basement. Koehler's belief, as reflected in his statement, was simply that Ms. Lubner would have walked through the area to use the laundry on occasion, as anyone would. That belief does not rely on speculation or wilful ignorance about the layout of the house.

Accordingly, Ms. Lubner's Fourth Amendment rights were not violated because no disputed fact would show that Koehler deliberately or recklessly misrepresented facts in the supplemental report. *Franks* emphasizes that truthfulness depends on the reasonableness of the officer's belief, not the validity of the underlying facts. And Koehler's subjective belief is undisputed. Because the undisputed facts do not support the finding of a constitutional violation, Koehler is shielded by qualified immunity.[2]

---

[2] If Koehler had deliberately misrepresented facts in the supplemental report, the next step would be to consider whether those facts were material to finding probable cause for Ms. Lubner's arrest. It's not clear how, if at all, this supplemental report played any role in Ms. Lubner's arrest, and so I do not reach that question.

13

**II. Defendants are Entitled to Summary Judgment on Ms. Lubner's State Claims.**

Ms. Lubner also brings state-law negligence and malicious prosecution claims against Koehler and a state-law negligent training and supervision claim against Cedarburg and Chief McNerney. Koehler maintains that police investigations and training are discretionary, therefore insulated from suit by discretionary immunity.

**A. Supplemental jurisdiction is appropriate.**

Supplemental jurisdiction is appropriate over Ms. Lubner's state claims because these claims arise out of the same nucleus of operative fact as the federal claim: the supplemental report. Under 28 U.S.C. § 1367, "as under *Gibbs*, jurisdiction over a federal-law claim brings with it supplemental jurisdiction over a state-law claim arising from the same facts. That derivative jurisdiction, though, is to some extent discretionary; § 1367 spells out circumstances, again derived from *Gibbs*, in which a federal court may decline to hear a state claim falling within the statute's bounds." *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 27 (2025) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966)). A district court may decline supplemental jurisdiction if (1) the supplemental claim "raises a novel or complex issue of State law"; (2) it "substantially predominates" over the claims within the court's original jurisdiction; or (3) "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(1)–(3). "The rationale of the supplemental jurisdiction is economy in litigation." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007). "[W]here it is obvious how the claims should be decided," the federal court should retain jurisdiction in the interest of judicial efficiency, even if the federal claim dropped out. *See id.* Here, as explained below, it's obvious how the state claims should be decided, so

14

supplemental jurisdiction is appropriate even though I have already dismissed the federal count.

### B. Discretionary immunity protects the defendants' actions.

The actions challenged by Ms. Lubner are discretionary, and therefore protected by discretionary immunity. "No suit may be brought against any . . . governmental subdivision . . . for the intentional torts of its officers, officials, agents or employees nor may any suit be brought against such corporation, subdivision or agency or volunteer fire company or against its officers, officials, agents or employees for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions." Wis. Stat. § 893.80(4). "Quasi-judicial" or "quasi-legislative" are synonymous with "discretionary." *Scarpaci v. Milwaukee Cnty.*, 292 N.W.2d 816, 825–26 (Wis. 1980). "Immunity does not attach merely because the conduct involves discretion. The question is whether the decision involves the type of judgment and discretion that rises to governmental discretion, as opposed to professional or technical judgment and discretion." *Sheridan v. City of Janesville*, 474 N.W.2d 799, 802 (Wis. Ct. App. 1991) (citation modified).

#### i. Police investigation

Koehler wrote the supplemental report during a police investigation. Police investigations are discretionary activities, so Koehler's actions in documenting his investigation are immune from liability.

"The immunity defense assumes negligence," so the inquiry focuses "instead on whether the [government] action (or inaction) upon which liability is premised is entitled to immunity under the statute, and if so, whether one of the judicially-created exceptions to immunity applies." *Lodl v. Progressive N. Ins. Co.*, 2002 WI 71, ¶ 17. "If a nonjudicial public

15

officer is authorized in the exercise of his or her judgment and discretion to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of the public officer's authority, there is no liability for negligence or other error in making that decision." *Olson v. 3M Co.*, 523 N.W.2d 578, 587 (Wis. Ct. App. 1994)

*D.B. v. Cnty. of Green Lake*, 2016 WI App 33, addresses discretionary immunity and the ministerial exception in the police investigation context. In that case, the plaintiff argued that the police should have deduced or learned through additional investigation that serious criminal activity was occurring. 2016 WI App 33, ¶ 17. Similarly, here, Ms. Lubner argues that Koehler should have either learned through additional investigation that she couldn't walk down the stairs or foreseen that this observation would lead to charges against her. But "the 'how' and 'scope' of the investigation performed by the Police Department is a discretionary act rather than a ministerial duty." *Id.* The "how" and "scope" of Koehler's investigation is within his authorized scope of authority, therefore protected by discretionary immunity.

ii. Training and supervision

Ms. Lubner argues that supplementing a report in response to communication with an ADA raises serious training and supervision concerns. Pl.'s Resp. 24–25, ECF No. 27. Ms. Lubner does not cite any case that held a government actor liable for a state-law negligent training and supervision claim. *See id.* A "city's training and supervision of its police officers . . . involves governmental discretion." *Sheridan v. Janesville*, 474 N.W.2d 799, 803 (Wis. Ct. App. 1991) (in the context of training officers on arresting people with disabilities). "[T]he manner by which a police department chooses to train its officers is a discretionary function; therefore, the municipalities are statutorily immune from this claim." *Liebenstein v. Crowe*, 826

16

F. Supp. 1174, 1188 (E.D. Wis. 1992). Because training and supervision are discretionary, they are immune from liability under Wis. Stat. § 893.80(4).

### iii. Malicious Prosecution

Finally, for the reasons stated earlier, the malicious prosecution claim must also be dismissed. Under state law, a plaintiff must demonstrate that the defendant was a moving force in the effort to maliciously prosecute the plaintiff. *See Elmer v. Chicago & N.W. Ry.,* 43 N.W.2d 244, 246 (Wis. 1950). Here, the defendant was simply a detective who filed a report indicating what he believed were reasonable facts and assumptions. He did not display any malice, neither did he direct the apparatus of government towards the plaintiff.

## CONCLUSION

In sum, qualified immunity shields Koehler from liability on Ms. Lubner's § 1983 claim because the undisputed facts demonstrate that Ms. Lubner's Fourth Amendment rights were not violated. The malicious prosecution claim fails as a matter of law, and discretionary immunity shields the defendants from liability on Ms. Lubner's other remaining state claims. Ms. Lubner has also failed to identify any John Doe defendants and has not responded to the defendants' argument that they should be dismissed. Because the John Doe defendants are merely fictional placeholders, rather than actual defendants, I will dismiss any claims brought against them as well. Accordingly, the court **GRANTS** the defendants' motion for summary judgment, ECF No. 18, and orders the case **DISMISSED**.

**SO ORDERED** this 15th day of October, 2025.

_____
STEPHEN C. DRIES
United States Magistrate Judge